IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

# STATE OF TENNESSEE v. MICHAEL ANDERSON PEEK, alias BIG COUNTRY, alias MICHAEL PEAK, alias MICHAEL ANDERSON PEAK

**Direct Appeal from the Criminal Court for Hamilton County
Nos. 213107-213118, 213449-213450    Douglas A. Meyer, Judge**

_____

## No. E1998-00038-CCA-R3-CD - Decided
### May 3, 2000
_____

The defendant was convicted of fourteen felonies, consisting of various rape, robbery, and burglary charges arising from complaints of five victims. He received an effective sentence of ninety-nine years. Appealing these convictions, he alleged, *inter alia*, that the trial court should have severed the offenses, rather than allowing all five to be tried in a single trial; that blood, saliva, and hair samples should have been suppressed; that he should not have been shackled during the trial, and that his sentence was improper. Of these assignments, we find error in the trial court's allowing the complaints of all five victims to be tried in a single trial, and in the court's not following the required procedures before shackling the defendant during the trial. The errors were harmless and, accordingly, we affirm the judgment of the trial court.

**Tenn. R. App. P.  3; Judgment of the Criminal Court is Affirmed**

GLENN, J., delivered the opinion of the court, in which HAYES, J., and WALKER, SP.J., joined.

John Allen Brooks, Chattanooga, Tennessee, for the appellant, Michael Anderson Peek.

Paul G. Summers, Attorney General and Reporter, Elizabeth B. Marney, Assistant Attorney General, William H. Cox, III, District Attorney General, Charles Leland Davis, Assistant District Attorney General, and Caldwell H. Huckaby, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant, Michael Anderson Peek, was convicted in the Hamilton County Criminal Court of four counts of aggravated rape, one count of attempted aggravated rape, three counts of

rape, one count of aggravated robbery, two counts of robbery, and three counts of aggravated burglary for a total of fourteen felony convictions involving five victims. The defendant received an effective sentence of ninety-nine years. In this appeal, the defendant presents eight issues for review:

I.     Whether the trial court erred by denying a defense motion to sever the offenses;

II.    Whether the trial court erred by denying a defense motion to suppress evidence obtained pursuant to a search warrant for defendant's blood, saliva, and hair;

III.    Whether the trial court erred in requiring the defendant to wear a leg shackle during the trial;

IV.    Whether the trial court erred in admitting the testimony of Rebecca Adams for identification purposes;

V.    Whether the trial court erred in allowing Tennessee Bureau of Investigation Agent Joe Minor to testify as an expert regarding DNA testing and interpretation;

VI.    Whether prosecutorial misconduct occurred during opening statement;

VII.    Whether the trial court erred in denying a defense motion for change of venue;

VIII.    Whether the trial court erred as to the length and manner of service of the sentence imposed.

Based upon our review, we conclude that the complaints of each victim should have been tried separately and that the required procedures were not followed before restraining the defendant during trial. However, these errors were harmless, and we therefore affirm the convictions and sentences in this case.

## PROCEDURAL BACKGROUND

The defendant was indicted on October 30, 1996, for fourteen felonies against five victims, three living in apartment complexes in the East Brainerd area of Chattanooga and two living in houses in the East Lake area of Chattanooga. All complaints involving all five victims were tried in one trial which lasted a week. The following chart is illustrative of the indictments, convictions, and sentences:

1. Victim: T.P.[1]

    Indictment: No. 213109 for aggravated rape on 1/11/95
    Conviction  Aggravated Rape
    Sentence:    25 years for Class A felony, concurrent with No. 213107

    Indictment: No. 213108 for aggravated robbery on 1/11/95
    Conviction: Aggravated Robbery
    Sentence:    12 years for Class B felony, concurrent with No. 213107

    Indictment: No. 213107 for aggravated burglary on 1/11/95
    Conviction: Aggravated Burglary
    Sentence:    6 years for Class C felony

2. Victim: K.S.

    Indictment: No. 213111 for aggravated rape on 12/8/95
    Conviction: Rape
    Sentence:    12 years for Class B felony, consecutive to No. 213109

    Indictment: No. 213110 for aggravated robbery on 12/8/95
    Conviction: Robbery
    Sentence:    6 years for Class C felony, concurrent with No. 213111 and consecutive to No. 213109

3. Victim: G.C.

    Indictment: No. 213112 for aggravated rape on 1/26/96
    Conviction: Rape
    Sentence:    12 years for Class B felony, consecutive to No. 213111

    Indictment: No. 213113 for aggravated rape on 1/26/96
    Conviction: Rape
    Sentence:    12 years for Class B felony, concurrent with No. 213112 and consecutive to No. 213111

    Indictment: No. 213114 for aggravated robbery on 1/26/96
    Conviction: Robbery
    Sentence:    6 years for Class C felony, concurrent with No. 213112 and consecutive to No. 213111

---

[1]Because of the graphic nature of the evidence in these matters, the victims of the sexual assaults are identified by their initials.

4. Victim: K.T.

        Indictment:  No. 213117 for aggravated rape on 7/1/96
        Conviction:  Aggravated Rape
        Sentence:    25 years for Class A felony, consecutive to No. 213113

        Indictment:  No. 213118 for aggravated rape on 7/1/96
        Conviction:  Aggravated Rape
        Sentence:    25 years for Class A felony, concurrent with No. 213117 and consecutive to No. 213113

        Indictment:  No. 213115 for attempted aggravated rape on 7/1/96
        Conviction:  Attempted Aggravated Rape
        Sentence:    12 years for Class B felony, consecutive to No. 213113

        Indictment:  No. 213116 for aggravated burglary on 7/1/96
        Conviction:  Aggravated Burglary
        Sentence:    6 years for Class C felony

5. Victim: G.H.

        Indictment:  No. 213449 for aggravated rape on 7/30/96
        Conviction:  Aggravated Rape
        Sentence:    25 years for Class A felony, consecutive to No. 213117

Indictment: No. 213450 for aggravated burglary on 7/30/96
Conviction: Aggravated Burglary
Sentence: 6 years for Class C felony, concurrent with No. 213449.

The defendant's motion for a new trial was denied and he timely appealed.

## FACTS

Because of the issues raised on appeal, we will set out, in detail, the facts of each of the cases.

### Victim One

The first victim, T.P., a thirty-one-year-old single mother, testified that she lived in the Hamilton Point Apartments in the East Brainerd area of Chattanooga with her two young sons. On the morning of Wednesday, January 11, 1995, she had awakened her sons as usual, fed them breakfast, and waited with them for the school bus. At about 8:30 a.m., she returned to her apartment and was completing some paperwork in her bedroom when she heard her front door creak open. She walked toward her bedroom door and saw a man standing in the hallway. He wore a bandana over his face and some type of a hat to cover his hair. With his hand in his jacket pocket, he told her not to scream or he would "put a hole in" her. He told her to take off her glasses and turn around. He then went through her dresser until he found some stockings which he used to blindfold her. From that point on, she could see nothing and testified that she could not visually identify her attacker. She did tell him that her sons needed her and that he could take whatever he wanted if he would promise not to hurt her.

After T.P. was blindfolded, she was told to "disrobe" and sit down on the bed. Her attacker then told her to lay down on the bed where he fondled her and told her how pretty she was. He then penetrated her vaginally with his penis and ejaculated.

T.P. also testified that her attacker had asked her to "make love to him like I did my husband." After the rape, he asked if "it was good" for her and said that it "wasn't that good" for him. She chose to say nothing, fearing that if she said the wrong thing, he would kill her. He then went into her closet, took a pair of shoelaces out of her tennis shoes, tied her hands behind her back, and tied her feet. He took money from her purse and from a coin holder on top of the stove. After pulling telephone cords out of the walls, he came back to the bedroom and told her if she wanted to see her sons alive, she would "write this off as a bad experience" and learn to lock her door. He told her that "his boys" were watching her and that if she wanted to see her sons make it home, she would not call the police. Once her attacker had left and she was free, she locked her door and called the police using parts of telephone equipment she could piece together.

T.P.'s testimony was followed by the testimony of three of her neighbors: Patty Shipley, who lived in the apartment diagonally across from the victim; Renee Diane Moton, who lived with her son in the apartment directly across from T.P.; and Sherman Moton, the eleven-year-old son of Moton. Shipley positively identified the defendant as the man she saw outside the apartment

building as she was leaving on the morning of January 11, 1995, at approximately 7:15 a.m. The defendant was standing in front of T.P.'s car, "just kind of propped up there." Moton and her son positively identified the defendant as the man each saw standing at the end of the breezeway outside of the victim's apartment on the morning of January 11, 1995, at approximately 8:00 a.m. The defendant was leaning against a fence at the end of the breezeway and "looking out into the woods." In each case, the defendant and the witnesses had spoken, exchanging common greetings.

T.P. was examined by Dr. Bert Geer at the Erlanger Medical Center, according to police protocol for possible rape victims. Dr. Geer collected samples for a rape kit which were turned over to the Chattanooga Police Department for DNA testing. The victim's medical history and assault information form, a twenty-five question, preprinted form, included T.P.'s identification of the race of her assailant as African-American.

T.P. subsequently listened for approximately fifteen minutes to a tape of an interview between the defendant and Detective Bill Phillips of the Chattanooga Police Department under conditions agreed to by the defendant and the State. T.P. positively identified the voice of the defendant as the voice of her attacker.

The State's expert witness, TBI Agent Joe Minor, testified that the vaginal smears taken from T.P.'s rape kit had been tested at the Tennessee Bureau of Investigation's forensic services division in Nashville. The five-probe DNA test resulted in a DNA profile that matched the specimen obtained from the defendant with a probability of selecting an unrelated individual at random with a matching DNA profile—or the odds that someone other than the defendant would have the same DNA profile—being approximately one in 19,000 in the Caucasian population and approximately one in 22,000 in the African-American population. According to Agent Minor's testimony, greater than 99.99 percent of the population could be excluded as being the source of the DNA sample taken from T.P.

Based on these facts, the defendant was convicted of three separate felonies: aggravated rape for the vaginal penetration of the victim while leading the victim to reasonably believe that he had a weapon; aggravated robbery for the theft of money while leading the victim to reasonably believe that he had a weapon; and aggravated burglary for entering a habitation and committing a felony. The sentences, all concurrent for this series of acts, were twenty-five years, twelve years, and six years, respectively.

**Victim Two**

The second victim, K.S., a twenty-three-year-old, also lived at Hamilton Point Apartments but in a different building from T.P. K.S. testified that on December 8, 1995, she was returning home alone from her job at a local restaurant at approximately 2:20 a.m. Because all the parking places in front of her building were taken, she had to park on the side. She locked her car and, carrying her work apron in her hand, walked around to the front of the building when a man emerged from the breezeway. She could tell he was an African-American. She was not alarmed, thinking the man was one of her neighbors, until she noticed that he had his face covered. She began to

scream as he grabbed her from behind and covered her mouth with his hand. He told her to be quiet or he would hurt her. He steered her over to the side of the building where four air conditioning units were located behind a latticework fence and bushes.

Once they reached a space in the middle between two units, they stopped. K.S. was able to engage the defendant in a discussion of genital warts, which she claimed to have; of her roommate situation; and of the fact that she was menstruating. She testified that his tone with her was "very conversational, very calm, very deliberate, like not a thing in the world is going wrong here." He finally told her to take off all her clothes and be quiet or he would kill her. He allowed her to remove a tampon and then, taking her shoulders, pushed her over one of the units and penetrated her anally. K.S. testified that after the rape was over, the defendant asked for her money and took what he found in the pocket of her pants.

K.S. sought the help of neighbors who called the police. She was taken to the Rape Crisis Center where a rape kit was processed on her and given to the police. K.S. identified the race of her attacker as African-American on the victim's medical history and assault information form completed at the Rape Crisis Center.

On March 14, 1997, K.S. listened to the same voice exemplar that T.P. had heard. K.S. positively identified the voice of the defendant as the voice of the man who raped her.

The State's expert, Agent Minor, testified that the DNA profile from seminal fluid on the work apron used by the defendant to wipe himself after the rape was tested at the TBI laboratory and matched the defendant's with a probability of selecting an unrelated individual at random being approximately one in 27 billion in the Caucasian population and one in 195 billion in the African-American population.[2]

Based on these facts, the defendant was convicted of rape for the anal penetration of the victim and robbery for the theft of money from the victim's clothing. The sentences, both to be served concurrently, were twelve years and six years respectively. The sentences were ordered to be served consecutively to the twenty-five year sentence for the aggravated rape of T.P. in No. 213109.

**Victim Three**

---

[2]According to expert testimony, the difference in statistical probability rates for matches with someone other than the defendant among the victims is the result of differing grades of samples taken and therefore differing results as to each of the five DNA probes tested.

The third victim, G.C., a forty-four-year-old woman, testified that she was a resident of Hidden Creek Apartments, a complex in the same neighborhood as the Hamilton Point Apartments where victims one and two lived. G.C. testified that on Friday, January 26, 1996, at approximately 7:00 p.m., she had parked her car in the apartment lot and was walking toward her building when a man came toward her and then moved behind her and grabbed her, placing his hand over her mouth to prevent her from screaming. He threatened to stab her in the heart, a threat he repeated over the course of the events that followed. He dragged her to the bushes, pushed her down into the mud, and took the money she had in her purse. As she struggled, he dragged and pushed her through dense woods behind the apartment complex.

When they got to a clearing in the woods, the defendant stopped and told G.C. to take off all her clothes. The defendant first made her get on her knees and perform oral sex. Afterwards, he had her cover her eyes with her hands while he pulled his hat over her face so that she could not see. Later, he blindfolded her by tying her turtleneck sweater around her face. He then made her lie down and he penetrated her vaginally, telling her that "[y]ou're supposed to be enjoying this. I mean, act like you're enjoying this. You're supposed to pretend you're enjoying this." The defendant threatened anal rape but did not carry out this threat. Instead, he took laces from G.C.'s boots, tied her hands behind her back, tied her feet in front of her, and left her blindfolded with her own turtleneck.

Once free, G.C. ran into her apartment and called 911. She was taken to the Rape Crisis Center where a rape kit was processed on her and given to the police. She identified her attacker's race as African-American on the victim's medical history and assault information form completed at the Rape Crisis Center.

G.C. was unable to positively identify the voice on the exemplar as that of her assailant. She did testify that in the moments before the defendant grabbed her on the night of January 26, she recognized him as the same man who had passed her on the walkway just nights earlier, similarly bundled up.

Agent Minor testified that the DNA profile from vaginal swabs taken from G.C.'s rape kit were tested at the TBI laboratory and matched the defendant's profile with a probability of selecting an unrelated individual at random being approximately one in 370,000 in the Caucasian population and one in 777,000 in the African-American population.

Rebecca Adams, who lived in the same apartment complex in the unit beside G.C., testified to the following events of January 24, 1996, just two days before the defendant attacked and raped G.C.:

> It was late at night, I'd been working fairly late and it was after eleven o'clock at night. It was dark out and misty. It had been raining a little bit, I think. And I parked and got my mail and I was carrying two bags in my hand walking towards my apartment, which is on the other side of the parking lot. And as I walked across the parking lot, there was someone standing there in the shadows. It was

someone who was wearing a hooded jacket, and, and as I walked towards my apartment complex, that person moved out from behind the shadows and started walking towards me.

And I walked a little bit faster and that person fell in line approaching towards me, walking behind me. And I walked faster and he walked faster, and I could feel that any, within a short amount of time, he was going to be very, very close to me, and I was getting very concerned, and I didn't really know what to do, but I turned around and I said, "Hi, how are you?" And he, he just kind of stumbled. I think I took him a little bit by surprise, and he started – he moved a little bit and continued walking, but moved a little bit out of my direction, and then I just walked up to my apartment as quick as I could.

. . . .

Q. Okay. Do you, would you be able to recognize the person who was behind you when you, who you greeted?

A. Yes.

Q. Can you tell the jury whether or not that person is in the courtroom today?

A. Yes.

Q. And for purposes of the record and for the jury, could you identify who that person is?

A. The person in the blue shirt over there holding his hand up.

Based on these facts, the defendant was convicted of rape for sexually penetrating the victim by fellatio; rape for the vaginal penetration of the victim; and robbery for the theft of money from her purse. The sentences, all to be served concurrently, were twelve years, twelve years, and six years respectively. The sentences were ordered to be served consecutively to the twelve-year sentence for the rape of K.S. in No. 213111.

**Victim Four**

The fourth victim, K.T., a twenty-five-year-old single mother of two children, ages three and one, testified that on July 1, 1996, she was living in the downstairs apartment of a duplex she shared

with her sister, who lived in the upstairs apartment. The duplex is in the East Lake area of Chattanooga. On this night, K.T. had put her children to sleep on the couch and made a pallet for herself beside them on the floor because it was hot and her apartment had no air conditioning. At some point during the night, she woke up because someone was dragging her through the apartment. He had his hands over her nose and mouth.

K.T. testified that she started fighting and struggling against her attacker until he slammed her against a wall, telling her to stop fighting, and placed a knife to her throat. When she saw her three-year-old daughter in front of her, screaming and crying, she stopped fighting. Her attacker told her to send her daughter back to bed in the living room, and she complied. He then blindfolded her with one of her tee shirts and told her to take her clothes off. She was wearing a tee shirt and shorts and removed her shorts. Her attacker told her, "I hear you do it good, you better, because your life depends on it." He then forced her to perform oral sex on him in her bedroom. He led her back into the hallway, telling her to get down on the floor on her knees, and attempted to have anal sex with her. Instead he penetrated her vaginally, threatening to cut her throat if anyone showed up. Finally, he took her back into her bedroom where he tied her hands behind her back and then tied her feet to her hands, using a vacuum cleaner cord he had cut before the attack started, and leaving her lying on her stomach on her bed, blindfolded. Once he was gone, her three-year-old daughter came and took the blindfold off her mother and untied her hands and feet.

K.T.'s sister called the police, and the victim was taken to the Rape Crisis Center. A rape kit was processed on her and turned over to the police. K.T. identified her attacker as an African-American male on the victim's medical history and assault information form completed at the Rape Crisis Center.

Agent Minor testified that the vaginal slide and swabs from K.T.'s rape kit were tested at the TBI laboratory and matched the defendant's DNA profile with a probability of selecting an unrelated individual at random with a matching DNA profile—or the odds that someone other than the defendant would have the same DNA profile—being one in 50 million in the Caucasian population and one in 145 million in the African-American population.

K.T. also listened to the voice exemplar of the defendant for approximately fifteen minutes. She made a positive identification of the voice of the defendant as that of the man who raped her on July 1, 1996.

On cross-examination, K.T. testified that a few days prior to the attack, the defendant had driven by the duplex she shared with her sister on his motorcycle and spoken to the two sisters while they were sitting on the porch at approximately 11:00 p.m. He did not get off his motorcycle but commented that he had seen them from the gas station across the street and wanted to stop and say hello since he had not seen them for a number of years. K.T. testified that she recognized the defendant as someone she had known slightly some thirteen years earlier when the defendant was dating a woman who lived above her.

The events of July 1, 1996, led to four separate convictions: aggravated rape for the vaginal penetration of the victim while leading the victim to reasonably believe that her attacker had a knife; aggravated rape for the oral penetration of the victim while leading the victim to reasonably believe that her attacker had a knife; attempted aggravated rape for the attempted anal rape of the victim; and aggravated burglary for entering a habitation and committing a felony. The sentences for this series of acts were twenty-five years, twenty-five years, twelve years, and six years respectively. The sentences were ordered concurrent with each other, but the two sentences for aggravated rape and the sentence for attempted aggravated rape were ordered consecutive to the twelve-year sentence for the rape of G.C. in No. 213113.

**Victim Five**

The fifth victim, G.H., a fifty-one-year-old woman, testified that she lived in her own home also in the East Lake area of Chattanooga. G.H. testified further that she had gone to bed on a pallet in her living room because the air conditioning in her house was not working. When her alarm clock went off at 4:00 a.m. on July 30, 1996, she hit the snooze button and lay back down. Just as she was about to get up, she felt something touch her back. Then someone pushed her back down on her stomach and held something sharp to her neck, threatening to kill her if she did not remain quiet. The attacker blindfolded her with one of her shirts, rolled her over, and told her what he was going to do. G.H. testified to the following:

> Q. What did he tell you he was going to do?
>
> A. That he was going to have sex, but he was, you know, used vulgar language, so - -
>
> Q. Okay. So he - - if you don't mind telling the jury, just tell them specifically what he said?
>
> A. He told me he was going to fuck me like I'd never been fucked before.
>
> Q. Okay.
>
> A. And so then he proceeded to have sex and then he rolled me back over. He asked me -- he told me he needed $50. I told him I didn't have any money. And he said he was going to kill me if I didn't give him money. I said, "Well, I don't have any money." So then he tied my hands behind my back and tied my feet, and I just laid there, because he left, I guess, and, you know –
>
> Q. What were you thinking at that time?

A.    That he was going to kill me.

Q.    And how did he tie you?  What did he use to tie you and how
      did he tie your arms?

A.    My shoe strings.

G.H. testified that her attacker warned her not to call the police.  Once she had freed herself, G.H. went next door where neighbors let her in and called her son who came and placed a 911 call to the police.

G.H. was taken to the Rape Crisis Center where a rape kit was processed and given to the police. She was unable to identify the race of her attacker on the victim's medical history and assault information form completed at the Rape Crisis Center.   The victim was also unable to positively identify the voice of the defendant on the exemplar as that of her attacker because her attacker whispered.  She did note that her attacker had a slight Northern or "proper" accent.

The State's expert witness, Agent Minor, testified that the vaginal swab from G.H.'s rape kit matched the DNA of the defendant with a probability of selecting an unrelated individual at random having a matching DNA profile being approximately one in 276 billion in the Caucasian population and one in 195 billion in the African-American population.

Timothy Daniel Knight testified that he was living with his grandmother in the house next door to the victim at the time of the attack.  Knight testified further that in the early morning hours of July 30, 1996, he had gone to a gas station and bought beer.  When he came out, he saw the defendant, a man whom he had met a couple of years before through mutual friends, standing in the parking lot of the gas station.  The defendant asked Knight for a cigarette; Knight gave him the cigarette and then drove home.

Because his grandmother did not allow beer in her house, Knight sat in his car to drink and listen to the car radio.  Knight testified he saw the defendant walking down the street and called him to come over and join him in the car for a beer.  The time was approximately 2:00 a.m.

The defendant joined Knight in the car.  They talked, listened to music, and drank beer for about forty-five minutes.  Finally, Knight told the defendant that it was getting late and he had to get up and go to work soon, so Knight went inside his grandmother's house.  At that point, it was about 3:15 a.m.  Knight did not see where the defendant went.

Based on these facts, the defendant was convicted of aggravated rape for the vaginal penetration of the victim while leading the victim to reasonably believe he had a weapon and aggravated burglary for entering a habitation and committing a felony.  The sentences, both to be served concurrently, were twenty-five years and six years, respectively.  The twenty-five year sentence was ordered to be served consecutively to the rape sentence for victim four in No. 213117.

## ANALYSIS
## I. SEVERANCE OF THE OFFENSES

The defendant first argues that his convictions should be set aside and separate trials ordered because the trial court erred in denying his motion to sever the offenses involving the five victims.

In these matters, the Hamilton County Grand Jury returned fourteen indictments, encompassing all crimes alleged to have been committed by the defendant against the five victims. For instance, as to the first victim, the defendant was charged with aggravated rape, aggravated robbery, and aggravated burglary, as set out in three separate indictments. The complaints of the other four victims were charged in a similar fashion. The record does not reflect that there had been a consolidation of any of the indictments, either to consolidate all of the indictments or to consolidate the indictments by victim. Defense counsel did, however, file a motion for severance of the offenses, asking that the defendant have a separate trial as to each victim.

A hearing was held in this matter on March 13, 1997, on the defendant's written motion to sever, which had been filed on February 27, 1997. The parties and the trial court proceeded in the hearing apparently upon the assumption that the fourteen indictments had been consolidated. However, the record does not reflect that this was the case. Thus, it appears that even though a hearing was held as to whether the cases should be severed, they had never been consolidated in the first place.

Our supreme court has recently considered various aspects of consolidation of offenses in Spicer v. State, 12 S.W.3d 438 (Tenn. 2000); State v. Moore, 6 S.W.3d 235 (Tenn. 1999); and State v. Shirley, 6 S.W.3d 243 (Tenn. 1999). Moore and Shirley dealt with multi-count indictments, the defendant in each case requesting that certain counts be severed and tried separately. Spicer is most like the instant case in that it involved the consolidation for a single trial of two separate indictments, alleging child rape and aggravated sexual battery. The usual routes for joinder, consolidation, or severance are described in Spicer, 12 S.W.3d at 443-44 (footnote omitted):

> In the vast majority of permissive joinder and severance cases, the offenses sought to be joined have been consolidated by the state in the original indictment or information pursuant to Rule 8(b). In the usual case, therefore, the burden is on the defendant to move for a severance of those offenses and to satisfy the criteria of Rule 14(b)(1) before separate trials will be granted. Unless the defendant moves to sever the offenses prior to trial or at an otherwise appropriate time, the defendant waives the right to seek separate trials of multiple offenses. See Tenn. R. Crim. P. 12(b)(5); 14(a).
>
> Less frequently, however, the state may seek to consolidate offenses contained in multiple indictments upon motion pursuant to Rule of Criminal Procedure 13(a). When a defendant objects to the consolidation motion, the state must then demonstrate that the

-13-

offenses are parts of a common scheme or plan and that evidence of each offense is admissible in the trial of the others. After an objection to consolidation has been overruled, the defendant is not then required to immediately move for a severance in order to preserve a severance issue for appeal. Because the trial court in this situation is to consider whether consolidation is proper in light of Rule 14(b)(1), a rule that requires a defendant to formally move for a severance immediately after the objection to consolidation is overruled makes little practical sense. Further, such a rule would emphasize technicality of procedure over substantive fairness, would add unjustifiable expense and delay to the proceedings and would defeat the very purposes to be served by the Rules of Criminal Procedure.

Joinder of multiple offenses against a single defendant in a single indictment or consolidation of multiple offenses against a single defendant in a single trial are governed by Rules 8, 13, and 14 of the Tennessee Rules of Criminal Procedure, rules which are, therefore, closely related. Rule 8 states, in part:

**Rule 8. Joinder of Offenses and Defendants.**

(a) Mandatory Joinder of Offenses.—Two or more offenses shall be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13 if the offenses are based upon the same conduct or arise from the same criminal episode and if such offenses are known to the appropriate prosecuting official at the time of the return of the indictment(s), presentment(s), or information(s) and if they are within the jurisdiction of a single court. A defendant shall not be subject to separate trials for multiple offenses falling within this subsection unless they are severed pursuant to Rule 14.[3]

(b) Permissive Joinder of Offenses.—Two or more offenses may be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13 if the offenses constitute parts of a common scheme or plan or if they are of the same or similar character.

_____

[3]Rule 8(a) would have required that the separate indictments setting out the offenses as to each victim be tried in a single trial. Thus, the prosecution could not have multiple trials involving the same victim if all charges arose out of the same episode.

Rule 13 allows the trial court, at its option, to consolidate or sever offenses for trial in those instances where either the State or the defendant could have elected to consolidate or sever. See Tenn. R. Crim. P. 13, Advisory Commission Comments. Rule 13 states:

> (a) Consolidation. The court may order consolidation of two or more indictments, presentments, or informations for trial if the offenses and all defendants could have been joined in a single indictment, presentment, or information pursuant to Rule 8.

> (b) Severance. The court may order a severance of offenses or defendants before trial if a severance could be obtained on motion of a defendant or of the State pursuant to Rule 14.

Rule 14(b) states, in part:

> (1) If two or more offenses have been joined or consolidated for trial pursuant to Rule 8(b), the defendant shall have a right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others.

> (2) If two or more offenses have been joined or consolidated for trial pursuant to Rule 8(a), the court shall grant a severance of offenses in any of the following conditions:

> (i) if before trial on motion of the State or the defendant it is deemed appropriate to promote a fair determination of the defendant's guilt or innocence of each offense.

> (ii) if during trial with consent of the defendant it is deemed necessary to achieve a fair determination of the defendant's guilt or innocence of each offense. The court shall consider whether, in light of the number of offenses charged and the complexity of the evidence to be offered, the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense.

> (iii) if the Court finds merit in both a motion by the district attorney general for a continuance based upon exigent circumstances that temporarily prevent the State from being ready for trial of the joined prosecutions and an objection by the defendant to the continuance based on a demand for speedy trial. If the Court grants a severance

under this subdivision, it shall also grant a continuance of
the prosecutions wherein the exigent circumstances exist.

In Spicer, the court described the type of hearing which must be held before there can be a consolidation of offenses:

> A motion to consolidate or sever offenses is typically a pre-trial motion, see Tenn. R. Crim. P. 12(b)(5), and consequently, evidence and arguments tending to establish or negate the propriety of consolidation must be presented to the trial court in the hearing on the motion. Cf. Bruce v. State, 213 Tenn. 666, 670, 378 S.W.2d 758, 760 (1964) (stating that decisions to join offenses necessarily must be made prior to trial). Before consolidation is proper, the trial court must conclude from the evidence and arguments presented at the hearing that: (1) the multiple offenses constitute parts of a common scheme or plan, Tenn. R. Crim. P. 14(b)(1); (2) evidence of each offense is relevant to some material issue in the trial of all the other offenses, Tenn. R. Evid. 404(b)(2); Moore, 6 S.W.3d at 239; and (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant, Tenn. R. Evid. 404(b)(3). Further, because the trial court's decision of whether to consolidate offenses is determined from the evidence presented at the hearing, appellate courts should usually only look to that evidence, along with the trial court's findings of fact and conclusions of law, to determine whether the trial court abused its discretion by improperly joining the offenses.

12 S.W.3d at 445 (footnote omitted).

The proof presented by the prosecution at the hearing on the defendant's motion to sever consisted of the information set out in the affidavit for the search warrant and statements from the prosecuting attorney as to certain of the facts of each of the five cases. We will now examine that hearing to determine whether it complied with the Spicer requirements.

As to the three cases occurring in the East Brainerd section of Chattanooga, involving the victims T.P., K.S., and G.C., the defense attorney gave brief synopses of the facts of each case. He argued that the prejudice to the defendant of prosecuting in a single trial all cases involving all five victims would outweigh any probative value. The prosecuting attorney contended that all cases could be tried together. He advised the court that there were "DNA probe matches" on all five of the cases, and that the issue in each case was "identity." The prosecutor then argued that there were certain similarities in the cases and argued that all cases should be tried in a single trial because they were a "common scheme or plan . . . contemplated under Rule 14(b)(1) and for purposes of judicial

-16-

economy." Additionally, the prosecuting attorney referred the trial court to the affidavit to take hair and body fluid samples from the defendant for facts as to the two East Lake cases.

The court then denied the defense's motion for a severance, concluding that the evidence as to one victim would be admissible in trials of the others:

> All right. All right. I believe that under Rule 14(b)(1), that, that where it states, "If two or more offenses have been joined or consolidated for trial pursuant to Rule 8(b), the defendant shall have the right to a severance of the offenses unless the offenses are part of a common scheme or plan, the evidence of one would be admissible upon the trial of the others," and I believe that the evidence of one would be admissible on trial of the others, so let your motion for a severance be denied. We will try all of them together.

Although the offenses had not been consolidated, the trial court, apparently believing that this had occurred, appears to have ruled that the offenses were part of a "common scheme or plan" and that "evidence of one would be admissible" in the trial of the others. Accordingly, the trial court denied the motion for severance. It does not appear that consideration was given as to whether the prejudicial effect of all charges against the defendant being tried before a single jury was outweighed by its prejudicial effect.

The procedures are mandatory and explicit which must be followed in a hearing to determine the admissibility of proof of other crimes. They are explained in State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985):

> First [the trial judge] should have heard the evidence out of the presence of the jury for the purpose of determining whether or not the proof of commission of the prior crime and defendant's connection therewith met the clear and convincing test mandated in *Wrather v. State*, *supra*. If the proof had cleared that hurdle then the final test should have been whether or not its prejudicial effect outweighed its probative value. *See Bunch v. State, supra*.

> The record must show affirmative compliance with these two requirements as a mandatory pre-requisite for review by the appellate courts. The record in this case is silent of any indication whatever that the trial judge made either of these determinations.

The information provided to the trial court at the severance hearing consisted of statements of the prosecutor as to similarities among the incidents and the sworn statement set out in the search warrant affidavit. Testimony was not presented, as occurred in Shirley, to enable the trial court to review in a detailed and meaningful manner the facts as to each of the five victims. Without this information, the trial court could not adequately determine, as required by Spicer, whether "(1) the

multiple offenses constitute parts of a common scheme or plan, Tenn. R. Crim. P. 14(b)(1); (2) evidence of each offense is relevant to some material issue in the trial of all the other offenses, Tenn. R. Evid. 404(b)(2) . . . and [that] (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant, Tenn. R. Evid. 404(b)(3)." 12 S.W.3d at 445. Accordingly, it was error to allow the separate complaints of all five victims to be tried in a single trial. Based upon the evidence presented at the hearing, five separate trials should have been held.[4]

### Harmless Error

Having concluded that it was error for the cases involving all five victims to be consolidated into a single trial, we must next determine whether there must be new trial trials ordered.

No conviction is to be reversed on appeal "except for errors which affirmatively appear to have affected the result of the trial on the merits." Tenn. R. Crim. P. 52(a); see also Tenn. R. App. P. 36(b). The "line between harmless and prejudicial error is in direct proportion to the degree of the margin by which the proof exceeds the standard required to convict, beyond a reasonable doubt." Shirley, 6 S.W.3d at 242 (citing Delk v. State, 590 S.W.2d 435, 442 (Tenn. 1979)).

In this case, the State's proof exceeded by a wide margin the standard required to convict the defendant of the offenses beyond a reasonable doubt.

Therefore, because the evidence of guilt in all five cases was overwhelming, we conclude that it was harmless error for the trial court to fail to consolidate all of the indictments into a single trial, and new trials are not required to ensure that these convictions were not the result of unfair prejudice. However, it is essential that our concluding that the error was harmless not be taken to mean that error in consolidation of cases for trial will be determined to be harmless. Sufficient evidence must be presented at the pretrial hearing in this regard for a proper determination to be made as to whether consolidation or severance is required. Without such evidence, and appropriate findings of fact and conclusions of law, it is difficult for an appellate court to sustain an order of the trial court in this regard. As to these cases, it is only because of the strength of the proof in each that it is not necessary to reverse the convictions and remand for new trials.

### II. SUPPRESSION OF EVIDENCE

The defendant has attacked the validity of the search warrant obtained by investigating officers to obtain his blood, saliva, and hair samples, claiming that it did not establish probable cause.

---

[4]Although the record does not reflect that the fourteen indictments had ever been consolidated, for purposes of our analysis, we presume that this had occurred.

Our supreme court, in State v. Stevens, 989 S.W.2d 290, 293 (Tenn. 1999), set out the general rules regarding the issuance of a search warrant:

> As a general rule, a search warrant shall be used only on the basis of an affidavit, sworn before a "neutral and detached" magistrate, which establishes probable cause for its issuance. *See Jacumin*, 778 S.W.2d at 431; *State v. Moon*, 841 S.W.2d 336, 338 (Tenn. Crim. App. 1992). A showing of probable cause requires, generally, reasonable grounds for suspicion, supported by circumstances indicative of an illegal act. *State v. Johnson*, 854 S.W.2d 897, 899 (Tenn. Crim. App. 1993). Thus, the need for the magistrate to make a neutral and detached decision regarding the existence of probable cause requires that the affidavit contain more than mere conclusory allegations by the affiant. *Moon*, 841 S.W.2d at 338.

In obtaining the search warrant at issue in this case, Detective Phillips of the Chattanooga Police Department submitted his affidavit to the General Sessions Court of Hamilton County on August 6, 1996. The affidavit states as follows:

<u>AFFIDAVIT IN SUPPORT OF REQUEST
FOR SEARCH WARRANT</u>

STATE OF TENNESSEE   BEFORE THE HONORABLE
HAMILTON COUNTY:    RICHARD HOLCOMB, JUDGE
            GENERAL SESSIONS COURT,
            CHATTANOOGA, TENNESSEE

I, Bill Phillips, make oath that I am a Police Officer duly appointed as such in the State of Tennessee, City of Chattanooga, and have been an officer for seven and one-half (7-½) years. I, Bill Phillips, herein referred to as the affiant, further make oath as to the following facts:

1) That on July 1, 1996, at approximately 5:00 a.m., police were called to 1605 E. 40th Street, Apartment B in Chattanooga, Tennessee, in the East Lake Community to the scene of a reported rape. Upon arrival, Chattanooga Police Officer Malcolm Kennemore, found the victim, [K.T.], white/female, date of birth being 10/20/70, on the scene. She advised that she had been sleeping on the floor of her living room at this address. Ms. [K.T.] advised she was awakened by a hand being placed over her face. She was then taken to the hallway where a knife was placed to her throat and she was then blindfolded with a piece of a shirt. The male then forced Ms.

[K.T.] to her knees and vaginally raped her from behind with his penis. Ms. [K.T.] was then made to stand and bend over. She was again vaginally raped from behind, whereupon the male ejaculated on her back. The male then moved Ms. [K.T.] to the bedroom where she was forced to lie on her stomach on the bed. At this point, her hands and feet were tied together behind her back with a cord cut from the vacuum cleaner. At some point during the attack, the male suspect threatened to kill her. The male then departed through the back door of the residence.

Ms. [K.T.]'s four (4) year-old daughter witnessed part of the attack and described the perpetrator as a black male. The daughter helped untie her mother after the attack. Ms. [K.T.] then went upstairs to her sister's apartment and called the police. Later, Ms. [K.T.] was transported to the Rape Crisis Center for counseling and evidence collection. Entry to the residence appears to have been through an unlatched window, according to Detective Tim Chapin's Supplemental Report. The attacker was described by Ms. [K.T.] as speaking with a "Northern" accent. Ms. [K.T.] also indicated her attacker was the same height, or taller, than her current boyfriend who stands between 6'1" and 6'2" and that the assailant has a slight paunch.

2)     A subsequent interview with Ms. [K.T.] revealed that she recently had a somewhat hostile encounter with a black male at a sports bar known as "Jimmy D's" located on Rossville Boulevard (a short distance from her residence). This came about as a result of her declination of an invitation to dance with the individual she describes as a black male. She had never known the party from prior contact and did not know his name.

3)     That on July 30, 1996, at approximately 5:00 a.m., police were called to 3908 6th Avenue, Chattanooga, Tennessee, in the East Lake Community to the scene of a reported rape. Upon arrival, Chattanooga Police Officer Ty Cooper found a Ms. [G.H.], white/female, date of birth being 5/22/45 was the subject of a reported rape. Ms. [G.H.] related that she was asleep in her front room when she was awakened by an unknown male suspect touching her buttocks. She advised that she was pushed down when she tried to get up and she felt something like a knife being placed at her neck. The suspect then proceeded to have Ms. [G.H.] remove her gown and blindfolded her with a tee-shirt. The suspect was reported to have a "proper, clear, Northern" accent. The suspect initiated an attempt to have anal intercourse with Ms. [G.H.] from the rear, but when Ms.

[G.H.] stated, "I thought you weren't going to hurt me," the suspect relented and engaged in forcible vaginal intercourse instead. After the rape, the victim was bound lying in the floor of the living room. The suspect attempted to bind the hands and feet of Ms. [G.H.] behind her back in a fashion similar to that described by Ms. [K.T.] on July 1, 1996, but due to the physical characteristics of Ms. [G.H.], this was not possible. The assailant used shoelaces taken from shoes of the victim for this purpose. Her hands were then tied in front and the perpetrator asked for fifty ($50.00) dollars, as he departed but was informed by Ms. [G.H.] that she did not have any money. The assailant then stated "I'll kill you just like that nigger bitch if you call the police and I'll be right down the road." Ms. [G.H.] was unable to give any physical description of her attacker. The investigation revealed that entry into the residence was through a rear side window where exit also apparently took place. Doors to the residence apparently remained secure. Afterwards, Ms. [G.H.] was transported to the Rape Crisis Center for counseling and physical evidence collection. A rape kit which includes pubic hair combings and vaginal swabs was completed at this location and has now been forwarded to the Tennessee Bureau of Investigation Crime Lab for comparison with the collections in the [K.T.] rape on July 1, 1996.

4)    On July 31, 1996, at approximately 1:00 a.m., a Mr. Robert Flake was interviewed by the affiant. Mr. Flake stated that he was familiar with an individual meeting Ms. [K.T.]'s description of her attacker from a previous occasion at "Jimmy D's" sports bar. In his capacity as Night Manager for the bar, Mr. Flake stated he had observed this individual, a black male, in the bar, mostly pursuing the company of white females, some months earlier. (This bar has traditionally been exclusively frequented by "white" patrons). Mr. Flake had told Detective Tim Chapin on an earlier interview that he would ask a particular waitress who could give the individual's name. Mr. Flake subsequently gave your affiant the name "Michael". He described "Michael" as speaking with a "white" accent.

5)    In response to this development, your affiant contacted the local patrol officers of the midnight Fox Team in order to learn if they were aware of any black males, first name Michael, who lived within a one-mile radius of 1605 E. 40th Street.

6)    Chattanooga Police Officer Charlie Brown immediately made your affiant aware of an individual known as Michael Peet, aka Michael Peek, aka Michael Peak, who resides at 4219 14th Avenue, Chattanooga, Tennessee. This address is within one (1) mile of both

reported rapes, and most importantly, that he had witnessed Michael Peak walking between the hours of 1:00 a.m. and 2:00 a.m., the early morning of July 30th, 1996 in the 3400 block of Dodds Avenue. This location is seven-tenths (7/10's) of a mile by street travel from the scene of the attack on [G.H.] at 3908 6th Avenue. This sighting places Michael Peak in the vicinity of this rape within three (3) hours of the attack. Officer Brown went on to relate that Mr. Peak had a lengthy history of arrests. Your affiant conducted a computer search of the records which revealed charges of Residential Burglary and a recent Indecent Exposure wherein Peak listed New York as his place of birth. The reports indicate that Peak is between 6'2" and 6'4" in height.

7)    On August 6, 1996, at approximately 9:30 a.m., your affiant interviewed a Mr. Timothy D. Knight, white male, date of birth being 7/13/70, who resides at 3910 6th Avenue. This residence is adjacent to the residence of [G.H.]. Mr. Knight relates that he is familiar with a black male named Michael Peak. He has known Mr. Peak for three to four years. On the evening of July 29, 1996, Mr. Knight relates that he ran into Michael Peak in the 4000 block of Rossville Boulevard, Chattanooga, Tennessee, at the Conoco Station. This occurred between the hours of 10:30 p.m. and 11:00 p.m. Mr. Knight relates that he gave Mr. Peak some cigarettes and drove away from the Conoco. Mr. Knight then drove back to his residence where he parked on the curb facing the [G.H.]' residence. A short time later, Michael Peak came walking by, headed north on 6th Avenue. Mr. Knight then invited Peak into the car, where the two shared a 12-pack of "Tall Boy" Budweisers over the course of the next several hours. Mr. Knight states that both he and Peak got out of the car at approximately 3:15 a.m., and he did not notice in which direction Peak headed. Mr. Knight went straight into his residence, where he noticed the digital alarm clock reflecting either 3:15 or 3:17 a.m. Mr. Knight's first clue that something had happened next door was hours later when Ms. [G.H.] awakened him to help report the rape to the police.

8)    Consequently, your affiant spoke with Detective Tetzel Tillery, Officer Eyo Effiom, and Officer Charlie Brown, all of the Chattanooga Police Department. Each of the above-mentioned officers have known Michael Peak for several years primarily due to Peak's past employment as a "bouncer" at a bar once known as "Corkscrews and Confetti's". All of the above officers related that Michael Peak speaks with a "Northern" accent, prefers the company of white females, and is "high strung" and aggressive. He is also

described as a black male, standing between 6'2" and 6'3" with a slight pot-belly.

9) As of the date of this Affidavit, there are several contemporary unsolved homicides involving black female victims in Chattanooga where sexual attack cannot be ruled out as a motive for, or a consequence of the deaths, which include but are not limited to the following: Barbara Douglas, March, 1993; Teresa Beard, June, 1993; Marianne Marsh, August, 1992; and Sandra Suttles, 1991.

10) TABLE OF SIMILARITIES BETWEEN EVENTS AND CIRCUMSTANCES:
    1) [B]oth attacks within one (1) mile of suspect's residence. G.H. 7/10 mile; K.T. 8/10 mile.
    2) [V]ictims - both white females - suspect known to date only white females.
    3) Both victims live alone (K.T. with 4 year old daughter and one year old son, no adults).
    4) Both early morning attacks. G.H. - 0400; K.T. - 0500.
    5) Suspect forced entry through window (both unlocked).
    6) Both victims awakened and blindfolded.
    7) Suspect told both victims that he would kill them.
    8) K.T. described "small knife". G.H. said something "possibly small knife". Both put to neck.
    9) Both victims placed in position for "rear entry method of intercourse".
    10) Anal sex: attempted with K.T. but could not enter. Told G.H. he was going to but she talked him out of it.
    11) Bound: K.T. tied-up (hands and feet behind) with a cut cord from vacuum cleaner. Attempted same with G.H., using her shoe laces, but her arms were too short. Her hands were tied in front.
    12) Accent. K.T. described "trace of Northern accent". G.H. described "proper, clear accent. Possibly Northern".

Wherefore as such officer, acting in performance of my duty, pray the Court issue a warrant authorizing the search of the body of Michael Anderson Peak for items of evidence to include:

1. Blood;
2. Saliva;
3. Hair, to include pubic hair.

I pray the Court issue a warrant authorizing the search and seizure of the above-described items in such manner and quantity that

they might be tested for comparison to the swabbings and pubic hair combings previously collected as evidence and that the search be made within seventy-two (72) hours.

This the ___6___ day of ___August___, 1996.

/s/ Det. Bill Phillips
Chattanooga Police Department

We will now review the search warrant affidavit to determine whether it establishes probable cause.

All of the information in the search warrant affidavit came from either law enforcement officers, named victims of sexual assaults, or citizen informants. Thus, their credibility did not need to be established. United States v. Ventresca, 380 U.S. 102, 111, 85 S.Ct. 741, 747, 13 L.Ed.2d 684 (1965) ("Observations of fellow officers of the government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number."). Our supreme court explained in Stevens the reasons why information received from a citizen is credible:

> [A]n ordinary citizen who reports a crime which has been committed in his presence, or that a crime is being or will be committed, stands on much different ground than a police informer. He is a witness to criminal activity who acts with an intent to aid the police in law enforcement because of his concern for society or for his own safety. He does not expect any gain or concession in exchange for his information. An informer of this type usually would not have more than one opportunity to supply information to the police, thereby precluding proof of his reliability by pointing to previous accurate information which he has supplied.

989 S.W.2d at 294 (quoting State v. Smith, 867 S.W.2d 343, 347 (Tenn. Crim. App.1993)).

This court was presented with a situation nearly identical to that of the instant case in State v. Baker, 956 S.W.2d 8 (Tenn. Crim. App.), perm. app. denied (Tenn. 1997), in which the defendant was a suspect in a rape case which had occurred in Tipton County, and officers had obtained a search warrant to collect "a quantity of blood, saliva and pubic and head hairs from the person of Bobby Rydale Baker . . . suitable for testing." Id. at 13. The victim in Baker had been awakened at approximately 3:00 a.m., by an intruder who had entered her residence through a back bedroom window, disabled the telephone, and discarded on the floor of the bedroom a cigarette which he had been smoking. He placed a knife to the victim's throat as she was sleeping in her bed, threatened to kill her if she did not cooperate, and then sexually assaulted her. The victim's two children, ages eleven months and two years, as well as a friend's ten-year-old child, were also in the residence but slept through the attack. The intruder left the residence though the back door. Investigating officers found a footprint in the rear bedroom. Because of a heavy dew, officers discovered tracks of

-24-

footprints leading to the window which was the point of entry as well as leading from the back door of the residence. Aided by one of the officers who was a certified tracking instructor, they followed the footprints to the residence of the defendant's aunt and uncle. One witness, who knew the defendant, had seen him in the neighborhood the morning of the rape. Another witness had seen the defendant running "shirtless" from the victim's residence, while another had seen him knocking on the window at the residence of one of his relatives, trying to get someone to let him in. These were the details which officers set out in the search warrant in Baker to establish probable cause. We will now examine the affidavit which was the basis for the search warrant in the instant case.

Based upon our review of this affidavit, we conclude that it clearly established probable cause for the taking of blood, hair, and saliva samples from the defendant. According to the affidavit, rapes had occurred on July 1, 1996, and July 30, 1996, in the East Lake Community of Chattanooga. The daughter of the first victim described the attacker as a "black male." The first victim said that the attacker spoke with a "Northern" accent and was 6'1" or 6'2" or taller, and that he had a "slight paunch." The first victim also related to police that she had recently had a "somewhat hostile encounter" at a sports bar with a black male, whose name she did not know, when she declined his invitation to dance with him. The night manager of the sports bar, who was identified in the affidavit, told officers that a person meeting the description of the person with whom the first victim had had the "hostile encounter" was a black male named "Michael" who spoke with a "white" accent.

According to the affidavit, the second victim could not "give any physical description of her attacker." She said that he spoke with a "proper, clear, Northern" accent. Following a query from the investigator, police officers who were assigned to patrol the area of the rapes said they knew a black male named Michael Peek, aka Michael Peak, who resided within one mile of the two rapes and had been seen walking between 1:00 a.m. and 2:00 a.m. on the morning of the second rape, approximately seven-tenths of a mile from where the rape occurred. According to police records, the defendant had a "lengthy history of arrests," which included charges of residential burglary and indecent exposure. The defendant had given New York as his place of birth and, according to police records, he was between six feet two inches and six feet four inches in height. Chattanooga police officers told the investigating officers that the defendant spoke with a "Northern" accent, was between 6'2" and 6'4", and had a "slight pot belly."

According to the affidavit, the next-door neighbor of the second rape victim, who was personally acquainted with the defendant for several hours until approximately 3:15 a.m., sat in his car with the defendant as it was parked at the residence where the witness and the second victim lived. The witness and the defendant got out of the witness's car at the same time, but the witness did not notice which direction the defendant took. As the witness entered his residence next door to the second victim, he noticed that it was either "3:15 or 3:17" a.m. He learned of the rape later in the morning when the victim awakened him to help her call the police to report that she had been raped. The affidavit concluded by setting out fourteen "similarities" between the two rapes, and seeking a search warrant to take blood, saliva, and hair samples from the defendant.

In denying defendant's motion to suppress, the trial court stated:

All right. Mr. Dobson, in reading the affidavit of the detective, he reminded me of an FBI type affidavit, and I believe that he does cover everything that is necessary to set out probable cause, so let your motion to suppress be denied.

We agree with the trial court that the affidavit given in support of the issuance of the search warrant was sufficient to establish probable cause and, thus, justify the issuance of the search warrant for the items sought. In Baker, after reviewing the investigative efforts of police officers, as detailed in the search warrant affidavit, in a case similar to this, the court concluded:

> The affidavit given to support the issuance of the search warrant meets the requirements of the United States Constitution, the Tennessee Constitution, and the common law rules created by the appellate courts of this state. The affidavit recites in minuscule detail the nature of the crimes the appellant is alleged to have committed, the steps taken during the course of the investigation, and the information received from the independent witnesses having knowledge of the facts. The affidavit was clearly sufficient to justify the issuance of the search warrant.

956 S.W.2d at 13.

The affidavit in the instant case sets out in detail the nature of the crimes committed against both victims that the defendant is alleged to have committed; the steps taken during the investigation; information received from independent witnesses having direct knowledge of facts and events; and facts supporting an inference that the crimes were committed by a single perpetrator. Therefore, we hold that the challenged affidavit is sufficient to support a finding by the magistrate of probable cause to collect samples of the defendant's blood, saliva, and hair.

### III. USE OF SHACKLES

In his third issue, the defendant argues that he was prejudiced by the requirement of the trial court that he wear leg shackles during the jury trial over the timely objection of his counsel.

The United States Supreme Court noted that "[o]ne of the essential due process safeguards that attends the accused at his trial is the benefit of the presumption of innocence. . . ." See Estelle v. Williams, 425 U.S. 501, 517, 96 S.Ct. 1691, 1699, 48 L.Ed.2d 126 (1976) (stating that identifiable prison garb "surely tends to brand [the accused] in the eyes of the jurors with an unmistakable mark of guilt"). "The sight of shackles and gags might have a significant effect on the jury's feelings about the defendant," and they should be used as a last resort. Illinois v. Allen, 397 U.S. 337, 344, 90 S. Ct. 1057, 1061, 25 L.Ed.2d 353 (1970). "[C]ourts must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." Estelle, 425 U.S. at 503, 96 S. Ct. at 1693.

The decision to shackle a defendant lies within the discretion of the trial court; the test on review is abuse of discretion. See Kennedy v. Cardwell, 487 F.2d 101, 107 (6th Cir. 1973). "[O]nly upon a clear showing of necessity should shackles ever be employed." Id. at 111. In order for this Court to meaningfully review the trial court's decision to shackle the defendant, the trial court's reasons must be stated on the record. See id. at 107. In Kennedy v. Cardwell, the Sixth Circuit Court of Appeals suggested that holding a hearing is preferred practice. "In this way factual disputes may be resolved and a meaningful record preserved for an appeal. . . ." See id. at 110. Three procedural safeguards to the employment of shackling were set out by this court as follows:

> (1) That the trial court should enter into the record of the case the reasons for the use of restraints, preferably in conjunction with a hearing;
>
> (2) That the record should show that the use of restraints is reasonably necessary and the least drastic security measure;
>
> (3) That adequate jury instructions should be given stating that the shackling should in no way affect the jury's determination of guilt or innocence or their assessment of punishment.

See Willocks v. State, 546 S.W.2d 819, 822 (Tenn. Crim. App. 1976) (relying on the American Bar Association Project on Standards for Criminal Justice, Standards Relating to Trial by Jury § 4.1(c)). Without these safeguards, "in-court shackling is inherently prejudicial to the defendant." Id.

In this case, the trial court did not conduct a hearing nor provide sufficient reason to justify the use of leg restraints when the defendant requested that they be removed. The trial court made an oblique reference to a situation "where a defendant needs to be restrained in the courtroom,"[5] but such a conclusion does not provide this court with any information by which we can assess whether the trial court's decision to use restraints complied with the safeguards contemplated by Willocks. We have no way of knowing what about this defendant led the trial court to believe that he should be restrained in leg shackles. There is nothing in the record to indicate what other security measures were available. "The fact that the defendant constituted a security risk [if such was the case here]

_____

[5]In discussing the cloths used to drape both State and defense tables, the trial court stated:

> It does, it does a better job than we had when we tried James Paul Franklin, the federal prisoner, and the marshals set it up and the marshals covered both tables at the time, and that's the way the Federal Courts handle the situation. And if it's good enough for the Federal District Courts, it's probably good enough for us where a defendant needs to be restrained in the courtroom.

-27-

does not automatically make shackling the least security measure necessary." State v. Thompson, 832 S.W.2d 577, 581 (Tenn. Crim. App. 1991). No instructions were given to the jury concerning the use of shackles. We assume that the reason for this failure to give instructions was that the trial court had taken measures to prevent the members of the jury from ever seeing the leg restraints on the defendant.

We hold that the trial court erred in failing to state on the record any clear showing of necessity for leg shackles.

**Harmless Error**

We must next determine whether the convictions must be reversed under the circumstances of this case. Because this is an issue of constitutional right to due process of law, the analysis to be used is that provided for constitutional errors, which is harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) (upholding the application of a harmless error analysis to federal constitutional errors in state criminal trials). The Chapman court noted that:

> All of these [harmless error] rules, state or federal, serve a very useful purpose insofar as they block setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial. We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction.

Id. at 22, 87 S.Ct. at 827. Since Chapman, the federal courts have narrowed the constitutional violations that require automatic reversal and expanded those that are subject to the harmless error rule to the point that in today's jurisprudence, the application of the harmless error rule is the norm and not the exception. See Rose v. Clark, 478 U.S. 570, 578, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986) ("[W]hile there are some errors to which *Chapman* does not apply, they are the exception and not the rule."). This court has applied constitutional harmless error analysis to the use of shackles. See State v. Thompson, 832 S.W.2d 577, 582 (Tenn. Crim. App. 1991) (holding that constitutional harmless error analysis applied where defendant was shackled during the trial).

In this case, the record shows that precautions were taken by the trial court to assure that the members of the jury had no opportunity to see that the defendant was restrained in leg shackles. Cloths extending to the floor covered both the State and defense tables, and the tables were repositioned so that the defense table faced the jury box, alleviating any chance that a juror might see behind the defense table. The defendant is unable to provide the court with any specific

incidence when he was seen in leg shackles by any member of the jury.[6]  Given the strength of the State's case, we hold that no prejudice to the defendant occurred as the result of the trial court's error in failing to comply with proper procedures for employment of shackles[7] such as to put into question the validity of the outcome of this trial.

## IV.  TESTIMONY OF WITNESS

In his fourth issue, the defendant asserts that the trial court erred in admitting the testimony of Rebecca Adams pursuant to Tennessee Rules of Evidence 404(b).

During a jury-out hearing, required by Rule 404(b)(1) before the admission of evidence of other crimes, wrongs, or acts for a non-propensity purpose, Adams testified that two days before the defendant raped G.C. at the same apartment complex, she had turned on the defendant who was following her in a manner that caused her to fear for her safety.  The defendant had emerged from shadows when Adams got out of her car late in the evening and started to walk toward her building, arms filled with groceries.  Adams was able to positively identify the defendant as that person both in the jury-out hearing and at trial.

The trial court ruled that the testimony of Adams was admissible for the non-propensity purpose of identification of the defendant, the central issue of this trial. We agree.  Defendant further argues that, even if the trial court held a jury-out hearing and even if the evidence was admissible for a non-propensity purpose, the trial court failed to comply with Rule 404(b)(3) and exclude the evidence if its probative value was outweighed by the danger of unfair prejudice.  One of the factors in weighing probative value is the degree of relevance of the evidence.  See State v. Edwards, 868 S.W.2d 682, 691(Tenn. Crim. App.1993).  "The similarity of the acts makes the probative value particularly significant."  Id.

The testimony of Adams, up to the point of her turning to the defendant, is strikingly similar to that of G.C., even to the detail of carrying groceries.  The defendant's method of waiting in the dark, dressed so as to veil his identity, for a lone, white female to emerge from her car in the

---

[6]In State v. Taylor, 771 S.W.2d 387, 396 (Tenn. 1989), defendant's assertion that the trial court committed prejudicial error by requiring that he appear shackled in court was found to be without merit.  Upon being polled at the close of the trial, all jurors stated that they had not seen the defendant in shackles during the trial.  Screening from jury view was employed in Taylor.

[7]We also make the cautionary note that our supreme court has stated that "it is inappropriate for the appellate courts to preside over the creation of a body of 'harmless error law'" arising from continued failure of a trial court to meet procedural requirements.  State v. Gorman, 628 S.W.2d 739, 740 (Tenn. 1982); see also State v. Richardson, 995 S.W.2d 119, 128 (Tenn. Crim. App. 1998), perm. app. denied (Tenn. 1999) ("At some point, the need to preserve the integrity of the judicial process will require that the continued practice not be subject to the harmless error rule.").

apartment complex parking lot and start for her apartment, often with some item in her arms, and then of moving into a position where he could grab her from behind and quickly control her are present in both the stalking of Adams and the rape of G.C.. This identity evidence was highly probative, especially since the defendant claimed he was not guilty of this or any of the other four rapes for which he was convicted. The probative value of Adams's testimony far outweighed any unfair prejudice to the defendant, and the trial judge did not err in admitting her testimony. This issue is without merit.

## V. EXPERT TESTIMONY

The defendant asserts next that the trial court erred in allowing Tennessee Bureau of Investigation Agent Joe Minor to testify as an expert regarding the DNA evidence after defendant's timely objection.

The admission of expert testimony is governed by Tennessee Rules of Evidence 702 and 703. The qualification of a witness as an expert is left to the sound discretion of the trial court. See State v. Ballard, 855 S.W.2d 557 (Tenn. 1993); Otis v. Cambridge Mut. Fire Ins. Co., 850 S.W.2d 439 (Tenn. 1992). Principles for the trial court to follow in deciding whether to admit scientific or technical evidence are set out in Rule 702, which states the following:

> **Testimony By Experts.** — If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702; see also McDaniel v. CSX Transportation, Inc., 955 S.W.2d 257, 264 (Tenn. 1997). Scientific or technical evidence, like all evidence, must first be relevant to a fact at issue in the case. See Tenn. R. Evid. 401, 402. If relevant, scientific or technical evidence must also meet the requirements of Rule 702.

Here, the defendant does not argue the relevance of the evidence but only that Agent Minor was not qualified by "knowledge, skill, experience, training, or education." Id. Rule 702. The expert, Agent Minor, testified that he had spent the past seven years in the DNA analysis unit of the crime laboratory of the Tennessee Bureau of Investigation; had both a Bachelor of Science and a Master of Science in Biology; had attended schools at the FBI Academy in Forensic Serology; and had studied bloodstain analysis methods, DNA typing methods, laboratory applications of DNA typing methods and advances aspects of DNA typing methods. His testimony concerning statistical analysis of DNA evidence was based on reliable FBI and TBI data. Agent Minor also testified that he works closely with Dr. Kasselberg, an eminent professor in the Department of Cell Biology at Vanderbilt University. Agent Minor stated that he had testified some twenty times concerning DNA analysis and DNA issues. Agent Minor was fully qualified by both education and experience in the field and his testimony was illuminating and thoughtful on a difficult subject. We conclude that the

requirements of Rule 702 were fully satisfied, and that the trial judge's admission of Agent Minor as an expert witness was not an abuse of discretion. This issue is without merit.

## VI. PROSECUTORIAL MISCONDUCT

In his sixth issue, the defendant argues that the prosecutor committed prosecutorial misconduct in his opening statement by becoming a witness himself and, additionally, by commenting on the fact that the defendant could not call a witness to dispute the general reliability of DNA evidence today.

When this court reviews allegations of prosecutorial misconduct, we must determine whether such conduct could have affected the verdict to the prejudice of the defendant. See Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976) (citing Harrington v. State, 215 Tenn. 338, 340, 385 S.W.2d 758, 759 (1965)). Factors relevant to that determination include:

1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.

2. The curative measures undertaken by the court and the prosecution.

3. The intent of the prosecutor in making the improper statement.

4. The cumulative effect of the improper conduct and any other errors in the record.

5. The relative strength or weakness of the case.

As to the prosecutor's becoming a witness, the defendant asserts that the prosecutor testified to the fact that he was an expert in DNA analysis. The defendant points to no specific statement in the record to support this allegation and we find none. The defendant's reliance on State v. Smith, 803 S.W.2d 709 (Tenn. Crim. App. 1990), is misplaced since in that case the prosecutor took part in a demonstration, yet because of his status, he was not subject to cross-examination. In this case, the opening statement of the prosecutor appropriately discussed the importance of DNA evidence to the State's case. The State's expert witness was fully cross-examined by the defense concerning DNA evidence. Further, the trial court noted the following at the hearing on defense motion for a new trial:

> And about the prosecutorial misconduct of Lee Davis, of course, I always charge the jury, and I told them before the trial started and after, that statements by attorneys and even the questions that attorneys make are not evidence, and so I don't find that Lee Davis made any, was guilty of any misconduct.

-31-

We agree that the allegation that the prosecutor essentially became a witness for the State is without merit.

The defendant further contends that the prosecutor acted improperly by stating that the defense would not call any witnesses who would disagree with the reliability of DNA evidence. The prosecutor stated in opening argument to the jury:

> There will be no one – I suggest to you it doesn't matter who the defense calls, there will be no one who will take that witness stand and tell you you can't believe DNA. If they choose to call someone – and they don't have to, I'll make that clear, they don't have to, they have absolutely no obligation to – but should they choose to, no one will, in this day and age, take the witness stand and say what they said about fingerprints, you know, in 1892, You can't trust them. There'll be nobody, because we've evolved past that point. In the last ten years, we have seen DNA do amazing things.

The general reliability of DNA evidence has been determined by the legislature in Tennessee Code Annotated § 24-7-117.[8] Therefore, the prosecutor was making an observation that is undisputed. The prosecutor also made it clear that the defense was under no obligation to present any evidence at all. We note further that this case was not a close one but one where the evidence of the defendant's guilt was substantial. We conclude that this issue is without merit.

## VII. CHANGE OF VENUE

---

[8]The section states:

> **DNA analysis—Admissibility in evidence.**—(a) As used in this section, unless the context otherwise requires, "DNA analysis" means the process through which deoxyribonucleic acid (DNA) in a human biological specimen is analyzed and compared with DNA from another biological specimen for identification purposes.
>
> (b)(1) In any civil or criminal trial, hearing or proceeding, the results of DNA analysis, as defined in subsection (a), are admissible in evidence without antecedent expert testimony that DNA analysis provides a trustworthy and reliable method of identifying characteristics in an individual's genetic material upon a showing that the offered testimony meets the standards of admissibility set forth in the Tennessee Rules of Evidence.

Tenn. Code Ann. § 24-7-117 (Supp. 1999).

In his seventh issue, defendant argues that the trial court committed reversible error by denying his motion for a change of venue.

The judgment of the trial court concerning the necessity to change venue in a criminal prosecution may be reversed only in a "strong case of error, apparent upon the record." State v. Bates, 804 S.W.2d 868, 877 (Tenn. 1991). The record does not reflect any difficulty encountered in the process of impaneling an impartial jury. Defendant offers nothing on appeal to support his allegation that the jury was biased by pretrial publicity. This issue is without merit.

## VIII.  SENTENCING

In his final issue, the defendant argues that the trial court erred in sentencing him to the maximum sentence for each conviction and in ordering that his sentences be served consecutively.

Review by this court of the length, range, or manner of service of a sentence is *de novo* on the record with a presumption that the determination made by the trial court is correct. See Tenn. Code Ann. § 40-35-401(d) (1997). This presumption applies unless the record demonstrates that the sentencing court did not properly consider sentencing principles and all relevant facts and circumstances. See State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

### A.  Application of Enhancement Factors

At the sentencing hearing, the trial court sentenced the defendant to the maximum penalty for each offense, with the sentences for crimes committed against each individual victim to run concurrently as to that individual victim, and consecutively, one victim to the next. The trial court found no mitigating factors but found three enhancement factors:

    (1)    The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;

    (6)    The personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great;

    (7)    The offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement.

Tenn. Code Ann. § 40-35-114.

No enhancement factor may be used to increase a sentence within the appropriate range unless the factor is established by the evidence. See State v. Melvin, 913 S.W.2d 195, 203 (Tenn. Crim. App.), perm. app. denied (Tenn. 1995); Tenn. Code Ann. § 40-35-210(g) (1997). Weight to be given each sentencing factor is left to the discretion of the sentencing judge. See State v. Gray,

960 S.W.2d 598, 610 (Tenn. Crim. App.), perm. app. denied (Tenn. 1997). When the court finds enhancement factors but no mitigating factors, as in this case, then the court may set the sentence above the minimum in that range but still within the range. See Tenn. Code Ann. § 40-35-210 (1997).[9]

## Factor (1)

Tennessee Code Annotated § 40-35-114(1) allows for enhancement of a sentence when "[t]he defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range." In this case, the defendant was determined to be a Range I offender. The trial court found that he had a previous history which included an arrest in 1987 for burglary with a conviction of attempt to commit a felony larceny.[10] The defendant's record of criminal behavior spans some fifteen years. See e.g. Gray, 960 S.W.2d at 611 (finding that criminal behavior of defendant spanning twenty years justified application of factor (1)). Enhancement factor (1) was properly applied to this defendant.

## Factor (6)

Tennessee Code Annotated § 40-35-114(6) provides for enhancement if the personal injuries to the victim or property taken were great. The property taken was not great in any of the robberies. None of the victims suffered serious physical injury. Nevertheless, personal injury in enhancement factor (6) is "broad enough to embrace the emotional injuries and psychological scarring sustained by the victim of a sexual offense. See Melvin, 913 S.W.2d at 203. Before this enhancement factor may be used, the State must establish "that the emotional injuries and psychological scarring are 'particularly great.'" Id. This court has found enhancement factor (6) applicable in rape cases in which victims suffered "depression, anxiety, and other emotional problems in addition to their physical injuries." State v. Williams, 920 S.W.2d 247, 259 (Tenn. Crim. App. 1995) (citing State v. Smith, 891 S.W.2d 922, 930 (Tenn. Crim. App. 1994)). The Williams court held that where a rape victim experienced periods of depression, suffered from low self-esteem, was often unable to

---

[9]We note the confusion in the record concerning whether the trial court should have begun determining the specific sentences at the minimum or midpoint in the range. Fortunately, the confusion has been eliminated by the 1998 amendment to the Criminal Sentencing Reform Act of 1989, which rewrote § 40-35-210(d) and (e). In this case, it was only necessary that the trial court stay within the appropriate range for each offense when applying enhancement factors, which the trial court did.

[10]The defendant complains that no certified copy of this felony conviction was ever placed into the record. The State notes an agreement of the parties during trial that this defendant had one felony conviction. The State suggested that a certified copy of that judgment be sent up immediately, and the trial court asked that a Ms. Clark call to get the copy. We assume this was done, but find harmless error if the certified copy, for some reason, failed to make it to the courtroom and into the record.

work, and had difficulty maintaining personal relationships, factor (6) had been appropriately applied by the trial court. See id.

T.P. testified at the sentencing hearing that she lives with a constant kind of fear that is so strong she is afraid to even let her dog outside after dark for fear of having to open her door again. She testified about her anxiety over little sounds; she never sits down to do paperwork now without checking all windows and doors to make certain they are locked. She testified that her two sons have terrible nightmares that someone will break in and hurt their mother and knowing that they have this memory has caused her great sorrow. K.S. testified at the sentencing hearing about the sick kind of feeling she has remembering the anal rape she endured. She testified that wearing winter clothes causes feelings of distress simply because she associates winter with the rape. K.S. has experienced symptoms of stress such as loss of concentration and inability to finish some conversations. K.S. spoke of the difficulty of seeing her family members suffer and of trying to maintain a relationship with her boyfriend. G.C. testified that her life has been a constant, day-to-day struggle. In her victim impact statement, G.C. described the fear she lives with, fear of retaliation, fear of HIV, fear of just being out after dark. G.C. stated that she trusts no one and views everyone as a potential attacker. K.T., the fourth victim, asked the trial court to consider the fact that the defendant committed his attack on her in the presence of her daughter. G.H., the fifth victim, although she did not testify at the sentencing hearing, testified at trial in detail concerning her fear that the defendant would somehow be able to retaliate against her for coming forward.

Because the record reflects that these victims suffered injuries beyond bodily injuries that were particularly great, we agree with the trial court that factor (6) could be used to enhance the defendant's sentences.

### Factor (7)

Tennessee Code Annotated § 40-35-114(7) provides for enhancement of the sentence where the offense was committed in order to gratify the defendant's desire for pleasure or excitement. Our supreme court has rejected the view that every rape is implicitly performed for the purpose of pleasure or excitement and has stated that brutality, revenge, and hatred may also be motivating causes for rape. See State v. Adams, 864 S.W.2d 31, 34 (Tenn. 1993). Therefore, neither pleasure nor excitement is an essential element of the offense of rape, and factor (7) may be considered as an appropriate enhancement factor. See id. The State has the burden of demonstrating that the rape was motivated, at least in part,[11] by the perpetrator's desire for sexual pleasure or excitement. See id. This desire has been shown when "overt sexual displays were made, such as when a defendant fondled, kissed, or behaved in a sexual manner, or when the perpetrator acted while making sexually

---

[11]Our supreme court has held that "[t]he motive need not be singular for the factor to apply, so long as defendant is motivated by defendant's desire for pleasure or excitement. . . . Clearly, the state need not prove a singular motive for the offense to rely on factor (7) in the appropriate case." State v. Kissinger, 922 S.W.2d 482, 490 (Tenn. 1996).

explicit remarks." Williams, 920 S.W.2d at 260 (citing Manning v. State, 883 S.W.2d 635, 639 (Tenn. Crim. App. 1994).

The record in this case is replete with testimony as to the defendant's sexually explicit comments to his victims, his fondling, his desire to have his victims think of him as a husband or lover. We conclude that, based on the record, the defendant committed these rapes to gratify his desire for pleasure or excitement and that the trial court correctly applied factor (7) as an enhancement factor.

We conclude that the record supports the application of enhancement factors (1), (6), and (7). The record fully supports the weight given to these factors by the trial court in sentencing the defendant to the maximum number of years for each offense.

### B. Consecutive Sentences

Finally, the defendant argues that his sentences should not be served consecutively. According to statute, the ordering of consecutive sentences is purely discretionary; nevertheless, the trial court must find by the preponderance of the evidence that at least one of seven criteria is met. See Tenn. Code Ann. § 40-35-115. Here, the trial court applied factor (4): "The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Id. § 40-35-115(b)(4). Criterion four has been specifically discussed by our supreme court in State v. Wilkerson, 905 S.W.2d 933 (Tenn. 1995), where the court held:

> [T]he imposition of consecutive sentences on an offender found to be a dangerous offender requires, in addition to the application of general principles of sentencing, the finding that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed.

Id. at 939. This requirement of additional findings has been recently limited to criteria (4). See State v. Lane, 3 S.W.3d 456 (Tenn. 1999). The record in this case fully supports the trial court's determination that criterion (4) should apply to run the sentences consecutively.[12] The defendant's crimes occurred over a period of approximately eighteen months during which time he stalked at least one woman who thwarted him, Rebecca Adams. The offenses involved terrorizing his victims by grabbing them from behind or dragging them from beds and blindfolding all but one victim; threatening physical harm; using a knife in at least two instances; and shoving and slamming two

---

[12]We note that the trial court failed to state for the record his findings but simply stated, "The Court does find that he is a dangerous offender, and that, therefore, he is subject to consecutive sentencing." We review the record *de novo* without any presumption that this determination is correct. See State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

victims against walls. His behavior in court – winking at one victim, sticking his tongue out at another, raising his hand for the jury – all indicated a complete lack of remorse or regard for the lives of his victims. The public clearly needs to be protected from this defendant. His trial on March 9, 1998, in the United States District Court for the Northern District of Georgia on two counts, one for rape and one for attempted rape, on federal park land indicated that these rapes were continuing acts of a dangerous person.[13] The ordering of consecutive sentences was also appropriate given the severity of these offenses.

We conclude that the trial court did not err in ordering that defendant serve his sentences as to each victim consecutively.

## CONCLUSION

Having found no reversible error, we affirm the convictions and sentences of the trial court.

_____

_____

[13]Defense counsel stated for the record that the defendant had been found guilty on both counts and sentenced to life in prison.